DISTRICT OF OREGON
**F I L E D**
April 11, 2023
**Clerk, U.S. Bankruptcy Court**

Below is an opinion of the court.

_David W. Hercher_
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Andre Eugene Joseph Duranleau**, | Case No. 21-31025-dwh7 |
| Debtor. | MEMORANDUM DECISION GRANTING MOTION TO SETTLE AND COMPROMISE[1] |

## I.    Introduction

Andre Duranleau, the debtor in this chapter 7 case, objects to the motion of the trustee, Kenneth Eiler, to approve a settlement with Acculign Holdings, Inc., and its shareholders.

For the reasons that follow, I will approve the settlement.

---

[1] This disposition is specific to this case. It may be cited for whatever persuasive value it may have.

Page 1 – MEMORANDUM DECISION GRANTING MOTION TO etc.

## II. Background

### A. *Shareholder agreements*

In 2018, Acculign entered into a shareholders' agreement. The shareholder parties are Duranleau, Charles Mora, and Adam Rose.[2] In 2018, Acculign and its shareholders entered into an amended stockholders' agreement. The shareholder parties to the 2018 agreement are Duranleau, William Langley, Mora, Rose, and Bridget Saladino.[3]

The 2013 agreement's governing law is that of Washington State,[4] and the 2018 agreement's governing law is that of Delaware.[5] The relevant agreement provisions are otherwise identical. The occurrence of a Call Option Triggering Event could entitle, and require, Acculign to buy a shareholder's stock.[6] For purposes of a call-option exercise, share value is "determined by appraisal."[7] If the parties agree on an appraiser, the share value is "determined by the appraiser."[8] Under section 7.4(f), each of the seller and the buyers "may present facts and opinions to the appraisers, and the appraisers will consider all relevant facts and opinions presented by the seller and the buyers." The appraiser's determination of the fair market value of the shares "will be binding on the seller and the buyers."[9]

---

[2] ECF No. 96-1 Ex. 1.
[3] ECF No. 95-2 Ex. 2.
[4] ECF No. 95-1 Ex. 1 at 24 ¶ 22.1,
[5] ECF No. 95-2 Ex. 2 at 29 ¶ 24.11.
[6] ECF No. 95-1 Ex. 1 at 5–8 § 6; ECF No. 95-2 Ex. 2 at 5–9 § 6.
[7] ECF No. 95-1 Ex. 1 at 9 § 7.3(b); ECF No. 95-2 Ex. 2 at 9 § 7.3(b).
[8] ECF No. 95-1 Ex. 1 at 10 § 7.4(a); ECF No. 95-2 Ex. 2 at 10 § 7.4(a).
[9] ECF No. 95-1 Ex. 1 at 10 § 7.4(d); ECF No. 95-2 Ex. 2 at 10 § 7.4(d).

If, as here, the parties jointly retain an appraiser, each side must pay half of the appraiser's fees, costs, and expenses.[10] If each side retains a separate appraiser, each must pay all of the fees, costs, and expenses of its appraiser.[11]

### B.    District-court action

In 2018, Duranleau and Saladino brought a federal district-court action in Oregon against Brewster Crosby, Macy Bishop, Preston Bishop, Bryant Kraus, Langley, Mora, and Rose. It was dismissed without prejudice.[12]

### C.    Arbitration

On July 31, 2019, Duranleau and Saladino submitted to the Arbitration Service of Portland a statement of arbitration claim against the Bishops, Crosby, Langley, Mora, and Rose, as respondents, requesting determination of the number of shares owned by each Acculign shareholder.[13]

On January 3, 2021, a panel of arbitrators issued an amended arbitration award. The award declared that (1) the 2013 agreement binds Acculign and all shareholders, and the 2018 agreement binds Acculign and all shareholders other than Mora and Rose;[14] (2) the respondents are shareholders;[15] (3) a "Call Option Triggering Event" had occurred as to Duranleau's shares,[16] and (4) Acculign had validly exercised its right to buy

---

[10] ECF No. 95-1 Ex. 1 at 10 § 7.4(h); ECF No. 95-2 Ex. 2 at 11 § 7.4(h).
[11] ECF No. 95-1 Ex. 1 at 10 § 7.4(g); ECF No. 95-2 Ex. 2 at 11 § 7.4(g).
[12] ECF No. 95-18 Ex. 18; ECF No. 1 Sched. A/B at 6 item 34.
[13] ECF No. 95-3 Ex. 3.
[14] ECF No. 95-4 Ex. 4 at 7–8 ¶ 1.
[15] ECF No. 95-4 Ex. 4 at 8 ¶ 2.
[16] ECF No. 95-4 Ex. 4 at 8–9 ¶ 4.

Duranleau's stock by following procedures in sections 7 and 8 of the shareholder agreements.[17]

### D.    *Appraisal*

On October 21, 2021, the parties, through their separately selected appraisers, jointly selected Lee Foster of BV Advisors to appraise the stock.[18] On February 25, 2022, BV issued its engagement letter, which was accepted by Acculign, Duranleau, and Saladino.[19] The signatories agreed that BV would appraise the fair-market value of the stock as of November 1, 2018, "for purposes of an internal shareholder buyout" in accordance with the amended arbitration award and section 7 of the shareholder agreement. They also agreed that the appraisal would be shared with Eiler as Duranleau's chapter 7 bankruptcy trustee and with the trustee in Saladino's case "as applicable to determine the disposition of the shares" in the bankruptcy cases.[20]

In the engagement letter, the parties reaffirmed the application of section 7.4(f) of the shareholder agreements,[21] and they made additional agreements about the appraisal procedure. Each party "will provide a copy of their submission and documents to the other party (through the use of a

---

[17] ECF No. 95-4 Ex. 4 at 9 ¶ 6.
[18] ECF No. 95-5 Ex. 5.
[19] ECF No. 95-6 Ex. 6.
[20] ECF No. 95-6 Ex. 6 at 1.
[21] ECF No. 95-6 Ex. 6 at 3–4.

secure web portal).”[22] BV would hold interviews “with each party” at which the opposing party and all parties’ lawyers could attend.[23] BV “may” contact shareholders, officers, directors, or employees “with follow-up questions,” and parties and their lawyers could be present for those questions.[24] Whether BV would “privately interview other witnesses, including key management,” would be “[a]t [BV’s] sole discretion.”[25]

On August 17, 2020, Foster sent the parties an email addressing “rebuttal submissions.” To avoid “rebuttals of rebuttals,” he asked that each party “just submit their respective rebuttal directly to us via email,” after which BV would make them available in “the sharefile so that all parties will be able to view them.”[26]

In Duranleau and Saladino’s comments to the draft appraisal, they accused BV of failing to share with them information that Crosby had provided to BV. In response, BV conceded that, on August 21, 2022, Crosby sent BV information on a shared Google Drive, and BV did not review that information until August 30, 2022. But on September 1, 2022, BV emailed all parties referencing the Google Drive and asking questions about its contents, thereby notifying them of BV’s receipt of the Google Drive. After BV discovered on October 12, 2022, that the information on the Google Drive had

---

[22] ECF No. 95-6 Ex. 6 at 3 ¶¶ 1, 5.
[23] ECF No. 95-6 Ex. 6 at 4 ¶ 2.
[24] ECF No. 95-6 Ex. 6 at 4 ¶ 3.
[25] ECF No. 95-6 Ex. 6 at 4 ¶ 4.
[26] ECF No. 95-7 Ex. 7 at 1.

not been downloaded to the sharefile available to all parties, BV made that download and notified all parties the next day, October 13. The draft appraisal was not issued until January 2023.[27]

Foster testified that BV received "volumes of information" and "detailed explanations" from both sides, and BV spent a "dramatic" number of hours and incurred fees "much higher than normal" to prepare the appraisal.

On February 16, 2023, BV issued its appraisal. The appraised fair-market value of the Acculign stock was $0.[28]

### E. Sheriff's sale of stock

In 2019, Weigel Properties, LLC, obtained Multnomah County, Oregon, Circuit Court general[29] and supplemental[30] judgments against Duranleau.

In August 2020, the circuit court administrator issued a writ of execution to the sheriff.[31] In early October, the sheriff issued a notice of levy on Duranleau's stock[32] and a notice of judicial sale of the stock to be held on October 20, 2020, at 12 noon.[33] The notice is addressed to Duranleau at addresses in Portland, Oregon, and Camas, Washington. The Portland address is the same one he used in his bankruptcy petition.

---

[27] ECF No. 95-9 Ex. 9 at 1–2 ¶ 4.
[28] ECF No. 95-8 Ex. 8.
[29] ECF No. 95-13 Ex. 13 at 4–7.
[30] ECF No. 95-13 Ex. 13 at 8–12.
[31] ECF No. 98-13 Ex. M.
[32] ECF No. 98-15 Ex. 15 at 28.
[33] ECF No. 95-15 Ex. 15 at 29.

The sheriff's return on the writ of execution states that the sheriff sent the notice by "certified return receipt mail and first class mail" on October 9, 2020, and "[i]t was later found that the certified return receipt mail was post marked with the date October 13, 2020." [34] According to envelope copies attached to a declaration of Duranleau, certified-mail envelopes addressed to the two addresses were postmarked as having been mailed on October 12, and a first-class envelope addressed to the Portland address was postmarked as having been mailed on October 13. [35] The envelope mailed by certified mail to Camas has a sticker stating "notify sender of new address," followed by an address in Vancouver, Washington. [36] Duranleau claims to have received none of the notices until approximately 7 p.m. on October 19, "only four business hours before the Sale was scheduled to occur." [37] He also claims to have received the notice postmarked October 13 in the afternoon of October 20, after the sale. [38]

According to an attachment to a declaration of a lawyer for Kirwin Partners LLC, a U.S. Postal Service tracking report for the certified-mail envelope sent to the Portland address states that it was delivered to an individual there on October 14 at 6:20 p.m. [39] According to an attachment to a

---

[34] ECF No. 95-20 Ex. 20 at 1–2.
[35] ECF No. 95-15 Ex. 15 at 19–21.
[36] ECF No. 95-15 Ex. 15 at 20.
[37] ECF No. 95-15 Ex. 15 at 15:15–16.
[38] ECF No. 95-15 Ex. 15 at 15:18–19.
[39] ECF No. 95-15 Ex. 15 at 59.

declaration of a Duranleau lawyer, a tracking report for the certified-mail envelope sent to the Camas address was out for delivery there on October 14 but was forwarded later that day and delivered to an agent for final delivery in Vancouver on October 19 at 3:21 p.m.[40]

On the morning of the sale, October 20, Duranleau's lawyer conveyed to Weigel's lawyer an offer to satisfy the judgment by paying the discounted amount of $35,000.[41] Weigel did not accept the offer.

Duranleau and his father attended the sale, and his father bid $50,000.[42] The successful bidder was Kirwin, which bid and paid $51,000.[43] Crosby testified that Kirwin is owned by himself and Preston Bishop.

Two days later, Duranleau delivered to Weigel's lawyer payment of the judgment balance, determined without any credit for Kirwin's $51,000 payment,[44] and Duranleau's lawyer emailed Weigel's lawyer to object to the timing of the sale notice.[45]

The next day, a lawyer for Multnomah County wrote to Kirwin stating that, because the sale notices were postmarked less than 10 days before the sale, it was void.[46] I heard conflicting testimony about whether the lawyer orally rescinded that contention.

---

[40] ECF No. 95-15 Ex. 15 at 47.
[41] ECF No. 95-15 Ex. 15 at 24:14–15.
[42] ECF No. 95-15 Ex. 15 at 16 ¶ 9.
[43] ECF No. 95-14 Ex. 14.
[44] ECF No. 95-15 Ex. 15 at 16 ¶ 11.
[45] ECF No. 95-15 Ex. 15 at 25:9–10.
[46] ECF No. 95-15 Ex. 15 at 45.

On October 28, 2020, the sheriff filed the return on writ of execution and deposited the sale proceeds for disbursement.[47] Two days later, the sheriff deposited the sale proceeds with the court.[48]

In late November 2020, Duranleau filed a motion to set aside the sheriff's sale to Kirwin as void due to the lack of 10 days' notice.[49] He filed an amended motion in April 2021.[50] On May 5, 2021, three days after the petition date in this chapter 7 case, the state court stayed consideration of the motion.[51]

### F. *Creditor claims and expenses*

#### 1. **Claims by and against Acculign and shareholders**

Rose filed a proof of claim, and I take judicial notice of proofs of claim filed by Acculign and the other represented shareholders, to which Duranleau has objected. Acculign's claim is for $1,543,906.88 for "underbid and mismanagement caused loss on bond claim."[52] The claims of the Bishops ($300,000),[53] Crosby ($113,209),[54] and Langley ($1 million)[55] are for securities fraud. Rose's claim is for $200,000 for breach of fiduciary duty and breach of contract.[56]

---

[47] ECF No. 95-15 Ex. 15 at 65–66.
[48] ECF No. 95-20 Ex. 20 at 9.
[49] ECF No. 95-15 Ex. 15 at 5.
[50] ECF No. 98-17 Ex. Q.
[51] ECF No. 98-10 Ex. J at 5.
[52] Claim 23-1; ECF No. 100.
[53] Claim 21-1; ECF No. 101.
[54] Claim 20-1; ECF No. 102.
[55] Claim 22-1, ECF No. 103
[56] ECF No. 95-21 Ex. 21; ECF No. 104.

Page 9 – MEMORANDUM DECISION GRANTING MOTION TO etc.

In Duranleau's asset schedule, of which I take judicial notice, he listed indemnification claims against Acculign for $71,198.58 and against its subsidiary Acculign Services, Inc., for $53,821.44.[57] He also listed as assets potential claims against (1) the represented shareholders, Kraus, and Mora for "RICO," previously brought in the U.S. District Court for the District of Oregon as Case No. 3:18-cv-02166-AC, which I referred to in part II.B on page 3 above, (2) Crosby, Langley, and Rose for shareholder oppression, and (3) Crosby, Langley, Mora, and Rose for defamation.[58] He also listed in his statement of financial affairs (SoFA), of which I also take judicial notice, the action entitled William G. Langley v. Bridget Saladino, et al., Multnomah County, Oregon, Circuit Court No. 19CV40892.[59]

## 2. Attorney and arbitration fees and expenses incurred by debtor

I take judicial notice that two law firms have filed proofs of claim: Scott Hookland LLP for $2,623[60] and Sussman Shank LLP for $39,289.17.[61]

Duranleau scheduled claims for attorney fees or legal services by three other entities that have not filed proofs of claim: Foreman Sturm Thede LLP for $4,771,[62] Slinde Nelson for $29,566,[63] and Perkins Coie LLP for $21,935.[64]

---

[57] ECF No. 1 Schedule A/B item 33.
[58] ECF No. 1 Schedule A/B item 34.
[59] ECF No. 1 Stmt. of Fin. Affairs at 4 item 9.
[60] Claim 1-1.
[61] Claim 18-1.
[62] ECF No. 1 Sched. E/F item 4.11.
[63] ECF No. 1 Sched. E/F item 4.18.
[64] ECF No. 1 Sched. E/F item 4.16

Duranleau listed in his SoFA a "civil collection action" against him by Landye Bennett Blumstein LLP,[65] the law firm through which he filed his arbitration claim.[66] That firm obtained general and supplemental judgments against Duranleau and Saladino for $137,695.83 as of March 8, 2021, and assigned those judgments to Kirwin.[67] Duranleau scheduled Kirwin as holding a judgment lien for $138,376.42.[68]

Duranleau also listed in his SoFA payments for the arbitration totaling $16,561.84, consisting of payments to a researcher of $1,250,[69] to his lawyer of $2,000,[70] to the arbitrators of $11,437.50,[71] and to a court reporter of $1,874.34.[72]

The sum of the above amounts that Duranleau paid to his lawyers and for the arbitration and the amounts he still owes his lawyers is $253,122.43.

## III. The motion and objection

On September 28, 2021, Eiler filed his motion and notice of intent to settle and compromise.[73] He mentions Duranleau's ownership of stock in Acculign, prepetition litigation among the shareholders, the sheriff's sale of

---

[65] ECF No. 1, Stmt. of Fin. Affairs item 9.
[66] ECF No. 95-3 Ex. 3 at 4.
[67] ECF No. 98-62 Ex. JJJ.
[68] ECF No. 1 Sched. D item 2.3.
[69] ECF No. 1 Stmt. of Fin. Affairs item 18 (Justice Solutions Group).
[70] ECF No. 1 Stmt. of Fin. Affairs item 18 (Terrance Kay, PC).
[71] ECF No. 1 Stmt. of Fin. Affairs item 18 (Christopher Kent, Edwin Harnden, Marshall Amiton).
[72] ECF No. 1 Stmt. of Fin. Affairs item 18 (Lehmann Court Reporting, Inc.).
[73] ECF No. 44.

Duranleau's stock and his motion to set it aside, and shareholder claims filed in this case exceeding $1 million. He describes the parties' agreement to settle Duranleau's challenge to the sheriff's sale and all other claims by Duranleau against Acculign, its shareholders, and Kirwin. The sheriff's sale would be confirmed, leaving the stock with Kirwin; the $51,000 sheriff's-sale proceeds held by the state court would be disbursed to Eiler; litigation by Duranleau would be dismissed with prejudice; Eiler would release claims against Acculign, its shareholders, and their related parties; and the released parties would withdraw their proofs of claim.

The hearing on Duranleau's objection to the motion was continued three times at his request and was held over 14 months after Eiler filed the motion.[74]

At the hearing on the motion, the represented shareholders supported the motion.[75]

## IV.  Analysis

### A.  *Jurisdiction*

The represented shareholders argue that Duranleau lacks standing to oppose the settlement. They argue both that he lacks a concrete injury in fact that is remediable by the court (constitutional standing) and so-called

---

[74] ECF No. 83.
[75] ECF Nos. 94–97.

"prudential" bankruptcy standing, which a party has only if "directly and adversely affected pecuniarily."[76]

I disagree. If Duranleau is correct that the disputed stock is worth millions of dollars, there will likely be a surplus in this estate, which would then be returned to him. So, he has both a concrete injury (the threatened loss of his surplus) and a pecuniary interest in preventing the settlement.

The represented shareholders argue that the estate is in fact hopelessly insolvent because the appraisal proves that the stock is worthless. But that is an argument on the merits, and it would make no sense to decide the merits to determine whether the court has jurisdiction to decide the merits. A federal court has subject-matter jurisdiction as long as an asserted claim is arguable—in other words, not "completely devoid of merit as not to involve a federal controversy."[77]

A similar question is whether the represented shareholders have standing to argue in favor of the settlement. Although they have filed proofs of claim, if the settlement is approved, they will withdraw their claims, so they will cease to be creditors. The reason that creditors generally have standing to be heard on settlements is that the proceeds of the settlement will ultimately be paid to them. Here, because these creditors necessarily *won't* be paid out of

---

[76] *Matter of* Point Ctr. Fin, Inc., 890 F.3d 1188, 1191 (9th Cir. 2018) (internal citations omitted).
[77] Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998), quoting Oneida Indian Nation of N. Y. State v. Oneida Cnty., New York, 414 U.S. 661, 666 (1974).

Page 13 – MEMORANDUM DECISION GRANTING MOTION TO etc.

the proceeds if the settlement is approved, they're not really entitled to be heard as creditors. But because they are parties to the settlement, which will benefit them at least by releasing them from estate claims, they have both constitutional and prudential bankruptcy standing to be heard in support of the motion. In any case, Eiler has that standing, and at the hearing, he adopted the represented shareholders' arguments and evidence in support of the motion as his own.

### B.    *Eiler's investigation*

Eiler testified regarding his experience as trustee and the procedures he followed in this case that led to the proposed settlement. In general terms, he considered the amount of estate funds available to pay for evaluation and prosecution of estate claims and defenses, the benefit of doing so, and the time that would be required to do so. He investigated and analyzed claims by and against the estate that Duranleau listed in his asset and liability schedules, questioned Duranleau at the meeting of creditors, and listed to suggestions of Duranleau and others. Eiler sought the views of Arnold Wuhrman, who is Duranleau's lawyer, and Kim McGair, who is the lawyer for the Bishops, Crosby, and Langley. Eiler reviewed documents provided to him, including Duranleau's district-court complaint and the arbitration award, and pleadings in the Weigel litigation.

Eiler said that the estate has no funds. In response to Eiler's inquiry, Wuhrman told Eiler that Wuhrman was unaware of a lawyer willing to

handle the litigation on a contingency basis, and Eiler is otherwise unaware of a lawyer willing to do so. Six creditors are law firms that previously represented Duranleau in litigation without being paid in full. Just one of those law firms, Landye Bennett, had (and assigned to Kirwin) a judgment exceeding $100,000. The size of the unpaid legal claims reflected the complexity of the litigation and the likely significant additional cost to prosecute the litigation. Eiler's testimony about legal fees is corroborated by the documentary record described in part II.F.2 beginning on page 10 above.

Eiler described the likely economic effect of the settlement. The claims against the estate that would be withdrawn by the Acculign parties exceed $3 million. Duranleau has an exemption exceeding $11,000, and the trustee's fee would be approximately $4,700. The state would incur tax of between $4,000 and $5,000, leaving $30,000. After payment of several priority claims, a dividend could be paid to general unsecured creditors of approximately 14 percent.

Although the represented shareholders offered in evidence a draft settlement agreement,[78] Eiler informed the court after the hearing that he seeks only approval of the motion and not the form of the agreement.[79]

---

[78] ECF No. 95-22 Ex. 22.
[79] ECF No. 121.

Page 15 – MEMORANDUM DECISION GRANTING MOTION TO etc.

## C.      Standard for approving settlement

In deciding whether to approve a settlement, a bankruptcy court must "compare the terms of the compromise with the likely rewards of litigation."[80] According to the Ninth Circuit's 1986 decision in *Martin v. Kane (In re A & C Properties)*,[81] a court making that comparison should consider four factors:

1.  the probability of success in the litigation;

2.  the difficulties, if any, to be encountered in the matter of collection;

3.  the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

4.  the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

"Each factor need not be treated in a vacuum; rather, the factors should be considered as a whole to determine whether the settlement compares favorably with the expected rewards of litigation."[82] The bankruptcy court "need not conduct an exhaustive investigation into the validity of the asserted claim."[83] If the court were to evaluate whether the settlement the trustee has negotiated is actually better than the result that would have occurred after trial, "the settlement approval process would degenerate into a trial of the underlying claims, which would defeat the purpose of settling."[84]

---

[80] Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968).
[81] 784 F.2d 1377, 1381 (9th Cir. 1986).
[82] Greif & Co. v. Shapiro (*In re* W. Funding, Inc.), 550 B.R. 841, 851 (9th Cir. B.A.P. 2016), *aff'd*, 705 Fed. App'x 600 (9th Cir. 2017).
[83] Alaska Nat. Bank of the N. v. Walsh (*Matter of* Walsh Const., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982).
[84] *W. Funding*, 550 B.R. at 852.

The court need only determine "whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"[85]

### D.     A & C *factor 1: The probability of success in the litigation*

Eiler's motion doesn't propose to settle just one pending or threatened claim by or against the estate. Instead, the settlement would resolve two specific actions—Duranleau's federal-court action and his challenge to the sheriff's sale to Kirwin in the Weigel action. And by broad releases from and to Eiler, the settlement would also resolve other, unenumerated actual or potential litigation. In addition to the district-court action, the hearing record refers to the litigation and potential claims by or against Acculign shareholders listed in part II.F.1 beginning on page 9 above.

The only litigation on which Duranleau bases his objection is the Weigel action and, by implication, a possible action to challenge the BV appraisal's binding effect on the parties. In essence, then, Duranleau's proposed alternative to the settlement is that Eiler—

- assert and prevail in litigation—

    o against Kirwin, recovering the stock for the estate, and

    o to determine that BV's $0-value appraisal of the stock does not bind the estate,

- obtain a replacement appraisal at a greater price, and

---

[85] *In re* W.T. Grant & Co., 699 F.2d 599, 608 (2d Cir. 1983), quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom.* Benson v. Newman, 409 U.S. 1039 (1972).

- dispose of the stock at that greater price, such as by a compelled purchase by Acculign.

In view of the scope of Duranleau's objection, I need not consider the risk that Eiler would lose any litigation other than the Weigel action and possible litigation to challenge the appraisal's binding effect on the parties. Specifically, I need not address the risk that he would lose if he were to pursue Duranleau's federal-court action or defend the bankruptcy claims that will be released.

## 1. Weigel litigation

### *(a) Evidence and argument*

Duranleau argues that the sheriff's mailing of the sale notices less than 10 days before the sale renders the sale void. Oregon Revised Statutes § 18.920(3) requires that notice of the sheriff's sale be mailed "not less than 10 days before an execution sale is conducted."

Kirwin argues that there is no legal authority supporting Duranleau's voidness argument. In Oregon Revised Statutes § 18.948(1), a challenge may be made to the manner of a sheriff's sale of real property, but no similar statute applies to a sale of personal property. Under Oregon Revised Statutes § 18.918(1), a judgment creditor must provide the sheriff with the name and address of the judgment debtor, but under 18.918(4), the creditor's failure to do so "does not affect the validity of an execution sale or in any way give that person any right to challenge the sale of the property." Kirwin argues that those statutes "indicate that an execution sale of personal property is

Page 18 – MEMORANDUM DECISION GRANTING MOTION TO etc.

intended to be a final determination of the ownership of any property sold and cannot be challenged by the judgment debtor."[86]

### *(b) Analysis and conclusion*

Duranleau has pointed to evidence, apparently undisputed, that the sheriff's-sale notices were not mailed at least 10 days before the October 20, 2020, sale. The mailings appear to have been on October 12 and 13, 2020.

On the other hand, Kirwin points to evidence that Duranleau had adequate actual notice of the sale and wasn't prejudiced by the delayed mailings. The mailings arrived at both of his addresses on October 14, giving him actual notice by then. The mailing to his Camas addresses was forwarded to an address in Vancouver, but he doesn't allege that Weigel knew or should have known to use the address in Vancouver rather than the one in Camas. And in any case, he had sufficient presale notice to arrange for his and attendance at the sale and bidding by his father. Nor does Duranleau argue that he requested at the sale that sheriff postpone it due to the mailing delay.

Duranleau points to no Oregon statute or case law that delayed sheriff's notice mailing renders void an execution sale of personal property (as opposed to real property)—especially where mailing sufficed to give the judgment debtor actual notice in time to participate in the sale without objection or request for postponement. Nor does he engage with 18.918(4),

---

[86] ECF No. 95-15 Ex. 15 at 55:1–7.

under which a judgment creditor's failure to provide the sheriff with the debtor's correct address does not affect the validity of an execution sale. Also, Kirwin advances the plausible argument that the statutory scheme should be interpreted to protect a buyer, such as Kirwin, who purchased at a personal-property execution sale without knowledge of any deficiency in notice to the debtor, especially when the debtor attends the sale without raising that deficiency.

Duranleau also argues that his payment of the judgment weighs in favor of setting the sale aside. But the payment was made two days after the sale, and it would make no sense to invalidate an otherwise valid execution sale—especially one to a buyer other than the judgment creditor—based on a later payment of the judgment.

There is a substantial risk that Eiler would not prevail in litigation with Kirwin, ending any opportunity for him to sell the stock.

### 2. Stock valuation

### (a) Evidence and argument

Duranleau doesn't challenge the arbitration award's determination of the quantity of his Acculign shares or that Acculign may (and, in his view, must) buy the stock in accordance with the shareholder agreements.[87] Assuming that the sale to Kirwin can be set aside, Duranleau concedes that "the only

---

[87] ECF No. 46 at 6:6–7.

dispute remaining to be litigated in this instance is the value of the Acculign stock to the estate."[88]

And Duranleau makes no argument that the call-option value may be determined other than through the appraisal process prescribed by the shareholder agreements. He concedes that "the one process which undisputedly must take place here [is] appraisal of the Acculign stock."[89] He explained the three hearing continuances he sought and obtained as necessary to facilitate the appraisal process.[90] In his third continuance motion, he affirmed that the parties had "spent a significant amount of time pursuing a neutral appraisal of the stock,"[91] for which they paid $34,000,[92] and that BV had been engaged with Duranleau's consent.[93]

At the hearing, Duranleau argued that BV failed both to consider all relevant information and to treat him fairly by giving him timely notice of information provided to BV by Crosby.

But according to Foster's testimony, BV interviewed all parties and gave them an opportunity to comment on a draft of the appraisal. BV considered and responded to comments from Duranleau, both before and after issuance of the draft appraisal in January 2023. On September 1, 2022, BV emailed all

---

[88] ECF No. 46 at 6:16–17.
[89] ECF No. 46 at 7:12–14.
[90] ECF No. 83.
[91] ECF No. 83 at 2:8–9.
[92] ECF No. 83 at 2:20–22.
[93] ECF No. 83 at 2:10–12.

Page 21 – MEMORANDUM DECISION GRANTING MOTION TO etc.

the parties about certain information that had been provided to BV by Crosby without being copied to Duranleau.[94] BV did not initially realize that Crosby hadn't shared certain information with Duranleau and Saladino. BV later realized that the information hadn't been shared and made it available to all shareholders on October 13.[95] BV declined Saladino's request that BV interview Kraus. BV was concerned that Saladino had sought to induce Kraus's favorable comments to BV by offering to drop litigation against him and give him a favorable employment recommendation. Duranleau and Saladino wanted BV to permit Doug Denny, their management advisor, to participate in BV's interview of them. Based on the objection of the Bishops, Crosby, and Langley, BV did not permit Denny's participation. On October 24, 2020, BV notified the parties that there would be no further interviews. Foster testified that "we had sufficient information" on the topics that any additional interviews would address." It's not unusual for an appraiser not to seek outside corroboration of information provided by insiders. The investigation process was not cut short due to prevent additional expense being charged to Duranleau and Saladino. After BV issued its draft appraisal in January 2023, it considered and responded to comments from Duranleau[96] and would have considered any additional comments through issuance of the final appraisal.

---

[94] *See also* ECF No. 95-7 Ex. 7 at 7.
[95] *See also* ECF No. 98-43 Ex. QQ.
[96] *See also* ECF No. 95-9 Ex. 9.

On February 16, 2023, BV issued the appraisal.[97] In a discussion of forecasts that had been provided to it, BV explained why it relied on forecasts by Crosby, "in the application of the discounted cash flow method," and by Saladino, for "the adjusted net asset value method."[98] BV's discussion of secondary adjustments addressed the December 20, 2019, call on the bond associated with the Chase Center project. Although the bond was called after the November 1, 2018, valuation date, "given the state of [the Chase Center] project as of the valuation date, including the cash flow constraints and the resulting delays, we believe this liability was knowable" to the extent of $1,232,720.[99]

### (b)   *Analysis and conclusion*

#### (1)   **Common-law limitation on judicial review of appraisal**

Under Washington law applicable to the 2013 agreement, according to a Washington Court of Appeals' decision in 1981, "[t]he general rule is that in the absence of mistake, arbitrary or capricious action or fraud, the decision by [a common-law] appraiser is conclusive upon the parties"; and "[o]nly where the appraiser has proceeded upon a fundamentally wrong basis may the court ignore the appraiser's findings."[100] In another decision that year, that court also held that "[a]rbitrary and capricious action has been defined as willful

---

[97] ECF No. 95-8 Ex. 8.
[98] ECF No. 95-8 Ex. 8 at 19–21.
[99] ECF No. 95-8 Ex. 8 at 33.
[100] Black Mountain Ranch v. Black Mountain Dev. Co., 627 P.2d 1006, 1009 (Wash. Ct. App. 1981).

Page 23 – MEMORANDUM DECISION GRANTING MOTION TO etc.

and unreasoning action without consideration and in disregard to facts and circumstances"; and "[w]here there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached."[101]

Under Delaware law applicable to the 2018 agreement, according to a Delaware Chancery Court decision in 2013, where "parties . . . agree to have the value that will be used as a contractual input decided definitively and without substantive review by a contractually designated party . . . [t]here is *no judicial review if no provision for such review is provided in the contract itself*."[102] And in a 2010 decision, that court agreed with parties that "as with a review of facts found by an arbitrator, this Court may only overturn the findings in a particular MAI [Member of the Appraisal Institute] appraisal if the appraisal is the subject of 'fraud, bad faith, or deception.'"[103]

Here, Duranleau hasn't pointed to evidence that BV's appraisal is the product of mistake, arbitrary or capricious action (willful and unreasoning action without consideration of and in disregard to facts and circumstances), or fraud, or that BV proceeded on a fundamentally wrong basis, as would be necessary to challenge an appraisal under Washington law. Nor has he

---

[101] Bennett v. Bd. of Adjustment of Benton Cnty., 631 P.2d 3, 4 (Wash. Ct. App. 1981).
[102] Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC, Civ. A. No. 4581-CS, 2013 WL 1955012, at *25 (Del. Ch. May 13, 2013) (emphasis in original).
[103] Julian v. Julian, Civil Action No. 1892-VCP, 2010 WL 1068192, at *4 (Del. Ch. Mar. 22, 2010).

pointed to any provision in the 2018 agreement permitting judicial review or to evidence that the appraisal is the product of fraud, bad faith, or deception, as would be necessary to challenge it under the 2018 agreement.

There is a substantial risk that a court would decline to entertain any judicial review of the appraisal, again ending any opportunity for Eiler to sell the stock.

### (2) Contractual appraisal standards

At the hearing, Duranleau questioned whether BV followed the appraisal procedures to which the parties agreed in the shareholder agreements and BV's engagement letter.

BV considered large volumes of information from all parties, and it declined to consider only minor amounts of potential information that, in its judgment, would have been unhelpful. BV did not intentionally delay Duranleau's access to the Crosby Google Drive information, which BV made available to Duranleau by October 13, 2022. Duranleau did not establish that he was materially prejudiced by that delay, especially because the draft appraisal was not issued until January 2023, and BV would have accepted further comments through issuance of the final appraisal on February 16, 2023.

Under all the circumstances, there is a substantial risk that a court, if it were willing to entertain judicial review of the appraisal at all, would conclude that BV (1) acted consistently with 7.4(f) and the engagement letter, (2) allowed Duranleau to present facts and opinions to BV and that BV

Page 25 – MEMORANDUM DECISION GRANTING MOTION TO etc.

considered all relevant facts and opinions presented to it, satisfying 7.4(f), (3) did not materially prejudice Duranleau by the delay in making the Google Drive information available to Duranleau, and (4) permissibly exercised its judgment in limiting attendance at interviews and whether to conduct additional interviews at Duranleau's request, satisfying the engagement letter. And in view of the parties' agreement that the stock value should be determined by binding appraisal, there is a substantial risk that the court would reject argument or evidence that BV simply came to the wrong value conclusion.

For all those reasons, I find that, in litigation that Eiler might bring to challenge the binding effect of the appraisal, there is a substantial risk that he would lose.

### E. A & C *factor 2: the difficulties, if any, to be encountered in the matter of collection*

Even if Eiler were to succeed in having a court determine that the BV appraisal does not bind the parties, the estate would end up better off only if both (1) the appraisal is redone with a new conclusion that the stock was worth more than $51,000 and (2) he is able to enforce payment of that amount from Acculign. Even then, the BV appraisal suggests that it would be difficult for Eiler to enforce payment from Acculign.

### F. A & C *factor 3: the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it*

There are no estate assets to pay lawyers, other than on contingency, to litigate against Kirwin and the other shareholders. The BV appraisal cost $34,000 and took nearly two years, belying Duranleau's prediction that it would be a "quick and easy process"[104] that would not "require any lengthy delay."[105] The estate would have to bear at least half the cost of a new, jointly retained appraiser, but it could not afford to do so because it has no assets.

Litigating against Kirwin and the other shareholders and redoing the appraisal would be expensive, inconvenient, and time-consuming.

### G. A & C *factor 4: the paramount interest of the creditors and a proper deference to their reasonable views in the premises*

No creditor, other than the represented shareholders, has voiced a position on the settlement.

## V. Conclusion

As applied to the Weigel litigation and the possibility of litigation over the binding effect of the BV appraisal, *A & C* factors 1 through 3 weigh in favor of the settlement, and factor 4 is neutral. Duranleau does not argue that the factors, as applied to other litigation, including the released claims against the estate, weigh against approval of the settlement.

---

[104] ECF No. 46 at 7:12–14.
[105] ECF No. 46 at 7:12–14.

Having compared the terms of the compromise with the likely rewards of litigation, I conclude that the settlement does not fall below the lowest point in the range of reasonableness and should be approved.

I will grant the motion and approve the settlement.

### #